WALTON W. SANDERSON AND BEVERLY SANDERSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sanderson v. Commissioner
Docket No. 17732-81.
United States Tax Court
T.C. Memo 1985-477; 1985 Tax Ct. Memo LEXIS 153; 50 T.C.M. (CCH) 1033; T.C.M. (RIA) 85477; September 12, 1985. *153 During 1975 and 1976, J. C. Penney Properties, a wholly owned subsidiary of J.C. Penney Company, Inc., constructed a department store and an automotive center on land that it owned. On April 23, 1976, J. C. Penney Properties leased the land pursuant to a long-term ground lease and sold the buildings to Penn-East Associates, Simultaneously with this transfer, the buildings were leased and the land was subleased to J.C. Penney Company, Inc. pursuant to a long-term net lease. On May 1, 1976, Penn-East Associates sold the buildings and assigned its interest in the net lease and the ground lease to Penn-Centennial Associates. During 1977, the taxable year in issue, petitioners had a 1.68919-percent limited partnership interest in Penn-Centennial Associates and they claimed their share of its interest expense and depreciation deduction on their Federal income tax return. Held, the transactions involving Penn-Centennial Associates did not lack economic substance. Held further, the interest expense paid in 1977 by Penn-Centennial Associates was not excessive; thus, no part of it represented prepaid interest. Held further, respondent failed to carry its burden of proof and did not establish *154 that Penn-Centennial Associates was an activity not engaged in for profit. Michael I. Sanders,Robert L. Deitz,Craig A. Emden,Jerald Pasternak, and Celia Roady, for the petitioners. Alan C. Levine, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Chief Judge: By notice of deficiency dated April 15, 1981, respondent determined a deficiency in petitioners' Federal income tax for the taxable year ended December 31, 1977 in the amount of $19,560. After concessions, the issues before us are: (1) whether petitioners' claimed share of Penn-Centennial Associates' losses should be disallowed because the transactions involving Penn-Centennial Associates lacked economic substance; (2) whether a portion of the interest expense paid by Penn-Centennial Associates represents prepaid interest; and (3) whether Penn-Centennial Associates was an activity engaged in for profit. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Petitioners, Walton W. Sanderson and Beverly Sanderson, were husband and wife during 1977 and resided in Chevy *155 Chase, Maryland at the time they filed their petition in this case. They timely filed their joint Federal income tax return for the taxable year 1977 with the Internal Revenue Service Center in Philadelphia, Pennsylvania. Petitioner Mr. Sanderson was president of the National Bank of Washington during the year at issue. Through his work and his investment in real property located in Maryland, he was knowledgeable about business and real estate transactions. J.C. Penney Company, Inc. (J. C. Penney) is a Delaware corporation that operates department stores and automotive centers throughout the United States. In 1974, J.C. Penney Properties, Inc. (J. C. Penney Properties), a wholly owned subsidiary of J. C. Penney, purchased land from R.H. Macy and Company, Inc. for $478,261.63. The land is located in Lawrence Township, New Jersey, which is 7 miles north of Trenton, New Jersey. Since 1974, real estate values in Lawrence Township have increased by an average of 10-15 percent per year, and as of April, 1976 there were no known or anticipated conditions that would have had an adverse impact upon this trend. During 1975 and 1976, J.C. Penney Properties constructed a department store *156 and an automotive center on the land at a total cost of $6,060,000. The land is part of an approximately 110-acre tract that was developed between 1968 and 1976 and is the present site of the Quaker Bridge Mall, which is a shopping center that contains over 100 retail stores. The four major tenants in the mall are J. C. Penney, "Bambergers," "Sears," and "Hahnes," and they are parties to an operating agreement that contains covenants with respect to the operation of the mall. The mall, which serves a region containing approximately 600,000 people, is well situated for a shopping center since it is accessible by all major highways in the area. In addition, it is located in an area that has had an impressive growth rate, particularly since 1970. On April 23, 1976, after negotiations at arms length, J. C. Penney Properties leased the land pursuant to a long-term ground lease and sold the buildings to Penntrent Associates, a Connecticut limited partnership, which was acting as an agent for Penn-East Associates (Penn-East), a Maryland limited partnership. Simultaneously with this transfer, the buildings were leased and the land was subleased to J. C. Penney pursuant to a long-term net *157 lease. The net lease required J. C. Penney, as lessee, to pay all taxes, maintenance, insurance and other charges with respect to the property and its use and occupancy. The total purchase price for the buildings was $6,060,000, which was financed by $127,260 in cash and two mortgage loans totaling $5,932,740 that were obtained from two banks, Seamen's Bank for Savings and East River Savings Bank. The promissory notes that represented the two mortgage loans were nonrecourse, provided for interest at the rate of 9-percent per annum on the unpaid principal balance, and were secured by the property. J. C. Penney had sold and leased back real estate for approximately 50 years, having entered into approximately 200 sale-leasebacks, including nearly 130 from 1967 to 1976. J. C. Penney's principal reason for using a sale-leaseback transaction was to preserve capital for its merchandise business. [1]
Penn-Centennial Associates (Penn-Centennial) is a Maryland limited partnership formed on April 26, 1976 to acquire the *158 buildings, which were being operated by J. C. Penney as a department store and a freestanding automotive service center, and to acquire a long-term leasehold interest in the underlying land. The general partners of Penn-Centennial are Norman R. Rales, Mervin A. Snyder and Continental Resources Corporation. Mr. Rales and Mr. Synder are experienced businessmen knowledgeable about real estate. The officers of Continental Resources Corporation in 1976 and 1977 were Thomas F. Kyhos and Steven M. Rales. Mr. Kyhos is an accountant and an attorney and was in the real estate business in 1976. Mr. Rales is an attorney and was also in the real estate business in 1977. The general partners were motivated to purchase these particular buildings because they believed that its risks were less than those in other potential investments. Their belief was founded on the fact that (1) the buildings were completed, which eliminated the risks associated with construction; (2) J. C. Penney was a major national company with a substantial net worth, which eliminated the problems associated with locating a suitable tenant; and (3) the net lease relieved Penn-Centennial of many traditional operating expenses *159 and management responsibilities associated with the operation of the buildings. Their goals with respect to the purchase of these buildings were preservation of capital, capital appreciation, cash flow, and tax benefits. On May 1, 1976, after negotiations at arm's length, Penn-East sold the buildings and assigned its interest in the net lease and the ground lease to Penn-Centennial. Penn-Centennial financed the acquisition of the buildings by executing a nonrecourse promissory note payable to Penn-East in the amount of $5,770,850, which was to be amortized over a 30-year period, with a principal balance of $892,182.31 due on May 1, 2006. The promissory note provided for an interest rate that varied over the term of the obligation and had an overall effective interest rate of approximately 11.9 percent. The interest rate on the note was approximately 38.5 percent in 1976, 10.7 percent in 1977 and 9.3 percent thereafter. Penn-Centennial also received funds totaling $1,465,200 from capital contributions of the limited partners, $14,800 from capital contributions of the general partners and $200,000 from a loan from the general partners. The ground lease, which was assigned to Penn-Centennial, *160 provided for a primary term of 30 years commencing on April 28, 1976, with the option to extend the lease for seven 5-year renewal periods. In the event J. C. Penney extended the net lease beyond 50 years, Penn-Centennial was granted the additional option of extending the ground lease for two more 5-year periods. Thus, the maximum potential term of the ground lease was 75 years. Under the ground lease, Penn-Centennial had the right, with the consent of the other parties to the operating agreement, to make additions or alterations to the buildings, to remove the buildings, or to construct additional buildings, provided it would not cause a material reduction in the fair market value of the land. Penn-Centennial also was entitled to retain any award made as compensation for the condemnation of the buildings and any insurance proceeds payable as a result of damage to or destruction of the buildings. The net lease, which was assigned to Penn-Centennial, provided for an initial term of 30 years with four 5-year renewal periods. If J. C. Penney spent more than $1 million to improve the buildings during the first 50 years of the net lease, it had the option to renew the net lease for *161 two additional 5-year periods. The net lease had a maximum potential term of 60 years, 15 years less than the ground lease' maximum potential term.Thus, during the last 15 years of the ground lease, Penn-Centennial was entitled to rent the buildings at the then fair market value. The rent under the net lease was fixed and payable in the following amounts: Annual fixed rental
First year of the net lease
$188,466
Next 9 years
552,066
Next 20 years
628,422
First renewal period
242,400
Subsequent renewal periods
181,800
Pursuant to an indenture of mortgage and a deed of trust, the rent was paid monthly by J. C. Penney to Mellon Bank of Pennsylvania, an independent corporate trustee. Mellon Bank used the rent proceeds to make the monthly payments required under the mortgage loans to Seamen's Bank for Savings and East River Savings Bank. Penn-Centennial received the excess, if any, of the rental payments over the monthly payments required under its promissory note to Penn-East. Beginning in 1978, the rental payments were such that positive cash flow was generated to Penn-Centennial. Pursuant to the net lease, J. C. Penney had the option at various times to purchase the buildings from Penn-Centennial. *162 Beginning April 30, 1986, if J. C. Penney determined that its operation of the buildings as retail stores was uneconomic, it had the right to terminate the net lease and offer to purchase the buildings from Penn-Centennial for a fixed price. [2] If Penn- Centennial rejected the offer, it would then be entitled to lease the buildings to a third party at the then fair market value. Beginning April 30, 1996, J. C. Penney had an option to purchase the buildings from Penn-Centennial at a price equal to the greater of a fixed price [2] or the then fair market value of the property. Finally, if J. C. Penney did not extend the term of the net lease in 2006 and the mortgage loans to Seamen's Bank for Savings and East River Savings Bank were outstanding, Penn-Centennial had the right to request J. C. Penney to purchase the buildings at a fixed price. [2]
In addition to these rights, Penn-Centennial had the right to sell, transfer or assign at any time its interest in the property and realize its appreciation, *163 if any.This right to sell, transfer or assign its interest in the property was subject to J. C. Penney's consent, which could not be unreasonably withheld. Further, J. C. Penney had a right of first refusal to buy the buildings from Penn-Centennial upon the same terms and conditions contained in the third party offer. On September 30, 1983, Penn-Centennial sold its interest in the buildings to National Property Analysts Partners (NPAP), a Pennsylvania limited partnership. The sale was approved by two thirds of the partners in Penn-Centennial. The purchase price was $7,600,000, which was financed by $1 million in cash and by NPAP executing a $6,600,000 nonrecourse note that provided an interest rate of 8 percent on the unpaid principal balance. On January 20-, 1984, J. C. Penney filed suit in Federal district court in New Jersey to compel Penn-Centennial to convey the property to it pursuant to its right of first refusal under the net lease to purchase the property under the same terms and conditions as NPAP. NPAP offered J. C. Penney $500,000 to waive its right of first refusal to purchase the property, which J. C. Penney did not accept. During the taxable year in issue, petitioners *164 had a 1.68919-percent limited partnership interest in Penn-Centennial, which they had acquired in the previous year in exchange for a $25,000 capital contribution. Their objectives with respect to this particular investment were to realize cash flow and long-term appreciation. Prior to their acquisition, petitioners were familiar with both the property and its adjacent area, and also had received and read the offering memorandum of Penn-Centennial. The offering memorandum described the economic and tax consequences of Penn-Centennial's acquisition of the property and the purchase price of an interest in Penn-Centennial. It stated that only persons whose income was subject to high rates of income taxation would derive full economic benefit from the investment. It also mentioned that Penn-Centennial sought limited partners whose taxable incomes were such that they were in the 50-percent tax bracket and had a net worth of at least $200,000, exclusive of home, furniture and automobile. For the year ended December 31, 1977, petitioners claimed their share of Penn-Centennial's losses. In his statutory notice of deficiency, respondent disallowed petitioners' claimed interest expense deduction *165 of $10,437, having determined that they had not established that it was allowable to any extent under the Internal Revenue Code of 1954. OPINION This case involves (1) a sale-leaseback transaction between J. C. Penney as seller-lessee, and Penn-East, as buyer-lessor; (2) the transfer by Penn-East of its interest in the property that was the subject of the sale-leaseback to Penn-Centennial; and (3) the investment by petitioners as limited partners in Penn-Centennial. Respondent maintains that the sale-leaseback transaction was a sham and should be disregarded for Federal income tax purposes because it lacked economic substance. He alternatively argues that, if the transaction was not a sham, it was a financing arrangement rather than a sale-leaseback. Thus, he contends that Penn-Centennial did not acquire the benefits and burdens of ownership in the property and that petitioners' claimed deductions for depreciation [3] and interest expense should be disallowed. Taxpayers generally are free to structure their business transactions as they see fit, even if motivated by tax avoidance, *166 provided a nontax or business purpose also is present. Gregory v. Helvering,293 U.S. 465, 469 (1935); Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 196 (1983), affd. in part and revd. in part on another issue 752 F.2d 89 (4th Cir. 1985). However, a transaction that is entered into solely for the purpose of reducing taxes and which is not supported by any economic or commercial objective is a sham and without effect for Federal income tax purposes. Frank Lyon Co. v. United States,435 U.S. 561, 583-584 (1978); Knetsch v. United States,364 U.S. 361, 365-366 (1960); Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 195-196. In Frank Lyon Co. v. United States,supra at 583-584, a sale-leaseback case, the Supreme Court stated that: [W]here * * * there is a genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached, the Government should honor the allocation of rights and duties effectuated by the parties. * * * This Court has interpreted this language to mean that, *167 to uphold the validity of a sale-leaseback transaction, the transaction must either satisfy a subjective "business purpose" test, or satisfy an objective "economic substance" test. [4]Estate of Thomas v. Commissioner,84 T.C. 412, 438-439 (1985); Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 201-203 n.17. The business purpose test focuses upon the motives of the taxpayer for entering into the transaction, and the economic substance test involves an analysis of whether the transaction had a reasonable possibility of profit apart from tax benefits. Whether a particular transaction is a sham under this analysis is a question of fact. Rice's Toyota World, Inc. v. Commissioner, 752 F.2d at 92, 94. In the instant case, while we have little doubt that tax benefits were a significant aspect of this transaction, the record establishes the fact that the investment in yhe buildings provided a realistic opportunity for economic profit apart from tax benefits. *168 The buildings, a department store and an automotive center, were part of a shopping center mall that contained over 100 retail store, including four major tenants. The mall served a region of apsproximately 600,000 people and was accessible by all major highways in the area. Real estate values in the area in which the mall was located had been increasing at a rate of 10-15 percent per year, which leads us to conclude that the buildings had a potential for equity buildup during the loan amortization period that provided Penn-Centennial a realistic opportunity, not only to recoup its investment, but to realize a return of economic profit on its investment. Our finding is buttressed by the fact that, in 1983, Penn-Centennial, pursuant to its right under the net lease agreement, sold its interest in the buildings to NPAP for $7,600,000, which enabled it to realize an economic profit on its investment. Respondent's expert witness, Mr. Chaiken, submitted a report and testified with respect to the sale-leaseback transaction. He evaluated the various documents involved in the transactions, including the terms of the net lease and ground lease agreements, and was of the opinion that the *169 transaction lacked economic substance. This opinion was based primarily on his calculation that the net present value of the projected cash flow over the term of the ground lease was negative $6.3 million (i.e., the rent over the period of the ground lease would be insufficient to satisfy the mortgage and interest obligations). We cannot give any weight to Mr. Chaiken's opinion, however, because his calculation was laced with numerous errors. Indicative of these errors is his determination that the cash flow for each respective year over the initial 30-year period under the net lease would be negative. The facts established that the projected cash flow, while negative in 1976 and 1977, was projected to be positive for all subsequent years. Another error was the fact that he amortized Penn-Centennial's note to Penn-East of $5,770,850 and its debt service payment of $1,680,000 over the 30-year period of the note and then deducted those amounts again in arriving at the negative net present value of $6.3 million. [5] *170 In addition, he attributed no value to Penn- Centennial's right to receive rental payments during the last 15 years of the ground lease at the then fair market value. [6]
Mr. Chaiken also appraised the fair market rental value of the department store to be $5 per square foot, which was higher than the average annual rental of approximately $3.54 per square foot that J. C. Penney was required to pay over the initial 30-year period of the net lease. His appraisal was based upon an analysis of 21 lease contracts entered into by retail stores, which he had deemed comparable to the net lease agreement in the instant case. His analysis, however, was flawed by the fact that the majority of these lease contracts had been entered into subsequent to 1976, the year the net lease in the instant case was entered into. It is interesting to note that only one of the 21 leases provided for an average annual rental over the initial period of the lease in excess of $5 a square foot, and that lease, which provided for an average annual rental of $5.94 a square foot, had been entered into in 1982. Of these 21 lease contracts, five were entered into in 1976 and *171 the average annual rental of these leases over their respective lease periods ranged from $2.02 to $4.14 a square foot, with the mean rental value being $3.11. This fair market rental value compares favorably with the $3.54 a square foot that J. C. Penney was required to pay under the initial 30-year period of the net lease and supports our finding that the sale-leaseback transaction was negotiated at arm's length. Respondent advances numerous contentions in an attempt to support his position that the sale-leaseback transaction lacked economic substance and should be disregarded for Federal income tax purposes. He contends that (1) the approximately 38-percent interest deduction taken by Penn-Centennial in 1976 did not have a bona fide economic purpose; (2) the fact that rental payments, under the terms of the net lease, were made to the Mellon Bank as trustee, rather than directly to Penn-Centennial, demonstrates that the partnership was never involved with the underlying business transaction; (3) the rental payments under the net lease closely approximated the principal and interest payments required under the two mortgage notes to the banks, thus generating an insignificant cash *172 flow during the 30-year period under the net lease; (4) Penn-Centennial was not liable on the outstanding mortgage notes payable to the two banks; and (5) J. C. Penney did not have a compelling reason to enter into the sale-leaseback transaction. While we agree with respondent that Penn-Centennial's interest deduction of approximately 38 percent in 1976 appears to be egregious and could well represent prepaid interest, [7] this does not alter the fact that its investment in the buildings provided a realistic opportunity for economic profit apart from tax benefits. The buildings were part of a shopping center that was located in an area that had a reasonable expectation of growth. Since 1974, real estate values in that area had been increasing by an average of 10-15 percent per year and there were no known or anticipated conditions that would have had an adverse impact upon this trend. Thus, economic benefits were foreseeable from the equity built up during the loan amortization period. Since we do not have a situation where the purchase price of the buildings exceeded their fair market value, [8] Penn-Centennial would not have been prudent to abandon such equity. Thus, respondent's *173 reliance on Estate of Franklin v. Commissioner,544 F.2d 1045 (9th Cir. 1976), affg. on other grounds 64 T.C. 752 (1975), is misplaced.[9] *174 We fail to see any merit in respondent's contention that the fact that (1) the rental payments were sent by J. C. Penney to an independent trustee instead of directly to Penn-Centennial; (2) insignificant cash flow was generated from the transaction because the rental payments closely approximated the principal and interest payments required under the notes; [10] and (3) Penn-Centennial was not liable on the outstanding mortgage notes payable to Seamen's Bank for Savings and East River Savings Bank demonstrates a lack of economic substance to the sale-leaseback transaction. These facts also existed in Dunlap v. Commissioner,74 T.C. 1377 (1980), revd. on another issue, 670 F.2d 785 (8th Cir. 1982), which involved a sale-leaseback transaction that the Court upheld for Federal income tax purposes. In Dunlap v. Commissioner,supra at 1400-1415, 1431-1437, *175 Safeway Stores, Inc. (Safeway) designed and built an integrated division office, a warehouse, and a distribution center on approximately 60 acres of land in El Paso, Texas. Safeway then conveyed its interest in the property to El Paso Properties, Corp. for $8,800,000. El Paso Properties, Corp. was a single-purpose financing corporation that was formed to acquire title to the property to secure financing of the purchase price of the property, to arrange a leaseback of the property to Safeway, and to transfer title of the property and the lease agreements to individual investors. The purchase price was raised by the subscriptions of eight individual investors, including the taxpayer, totaling $387,000 in cash and by El Paso Properties, Corp. placing $8,413,000 of secured notes with various institutional investors. The individual investors were not liable on the secured notes. The notes were secured, in part, by an indenture of mortgage and a deed of trust that required all payments of rent under the lease to be made directly to an independent trust and not to the lessor. The annual rental payments were calculated to provide the individual investors with just enough money to meet *176 the periodic payments of principal, interest, and yearly management fees for the initial 25-year term of the lease. The taxpayer claimed a deduction for his share of depreciation in the property and respondent disallowed it on the basis that the sale-leaseback transaction was a sham. In upholding the sale-leaseback transaction, the Court disagreed with respondent's position that the investment was purely tax motivated or that it presented no realistic opportunity for economic (nontax) gain. Dunlap v. Commissioner,supra at 1437. Finally, respondent argues that the sale-leaseback transaction lacked economic substance because J. C. Penney did not have a compelling reason for entering into the transaction. Once again, we fail to see any merit in this argument. The law requires that the transaction be compelled or encouraged by business realities. Frank Lyon Co. v. United States,435 U.S. 561, 583 (1978). In the instant case, J. C. Penney operated the buildings as a department store and an automotive center. Due to its perceived need to preserve capital for its merchandising business, J. C. Penney sold its interest in the buildings and simultaneously leased the premises back as tenants. *177 It is clear that its decision to enter into the sale-leaseback transaction was encouraged and justified by the economic realities of the business world. It should be noted that the general partners, who were knowledgeable about business and real estate transactions, had a business purpose for investing in the buildings via their capital contributions in Penn-Centennial. They were motivated by their belief that the investment would yield preservation of capital, capital appreciation, cash flow, and tax benefits. [11] We realize that, given our finding that the transaction had economic substance, a finding that the transaction also had a business purpose is not necessary. Estate of Thomas v. Commissioner,84 T.C. 412, 438-439 (1985). Respondent alternatively argues that, if the sale-leaseback transaction was not a sham, it was in substance a financing *178 arrangement. He maintains that J. C. Penney retained sufficient incidents of ownership through the provisions of the net lease, which placed numerous benefits, burdens and risks on J. C. Penney. He cites Sun Oil Co. v. Commissioner,562 F.2d 258 (3d Cir. 1977), revg. a Memorandum Opinion of this Court, as support for this position. Sun Oil, which preceded the Supreme Court's landmark decision in Frank Lyon Co. v. Commissioner,supra, involved a two-party transaction whereby an oil company sold service stations to a tax-exempt trust and simultaneously leased them back. In determining that the transaction was in substance a financing arrangement, the court focused upon the fact that (1) under the net lease, the lessee was responsible for all expenses normally associated with the maintenance of a building, [12] *179 (2) the rent was fixed at an amount that enabled the lessor to recover the funds it had advanced for the property plus accrued interest; and (3) the lessee had the option to repurchase the properties at a fixed amount that approximated the unpaid balance plus accrued interest on the funds advanced by the lessor in purchasing the property. Given the fact that these factors also were present in Frank Lyon Co. v. Commissioner,supra, which upheld a sale-leaseback transaction that involved multiple parties, a situation that is analogous to the instant case, we question the precedential value of Sun Oil. In any event, Sun Oil is readily distinguishable from the instant case because the transaction involved only two, and not multiple, parties. Furthermore, one of the parties was a tax-exempt pension trust. See Frank Lyon Co. v. Commissioner,supra at 575. Respondent also argued in desperation that the interest expense paid in 1977 by Penn-Centennial was excessive to the extent of $81,236 out of the $617,926 claimed as an interest deduction. He would disallow the $81,236 as a deduction on the grounds that it represented prepaid interest. His argument is based upon the fact that the interest rate on Penn-Centennial's note to Penn-East was 10.7 percent in 1977 and 9.3 percent in all subsequent years. The only evidence with *180 respect to interest rates in 1977 was an article submitted into the record by respondent, which stated that the interest rate in 1977 for mortgage financing was approximately 10.5 percent. This hardly supports respondent's contention that an excessive amount of interest expense was paid in 1977. Accordingly, we find that the interest expense paid in 1977 was not excessive; thus, no part of it represented prepaid interest. Lastly, in his amended answer, respondent also disallowed petitioners' claimed share of Penn-Centennial's depreciation deduction on the grounds that Penn-Centennial's activities were not engaged in for profit. Respondent has raised a new matter in his amended answer for which he bears the burden of proof. [13] *181 Rule 142(a), Tax Court Rules of Practice and Procedure. For the year 1977, the partnership (Penn-Centennial) took a depreciation deduction for the buildings. Section 167(a) allows as a depreciation deduction a reasonable allowance for the exhaustion of (1) property used in a trade or business, or (2) property held for the production of income.Thus, absent a trade or business, the partnership is not entitled to the deduction pursuant to section 167(a). [14] *182 A partnership does not constitute a trade or business unless the partnership is engaged in the activity with the predominant purpose and intention of making a profit.[15]Flowers v. Commissioner,80 T.C. 914, 931 (1983); Siegel v. Commissioner,78 T.C. 659, 698 (1982); Brannen v. Commissioner,78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984). Although it is not necessary that the partnership's profit-making expectations be reasonable, its profit objective must be in good faith. Sec. 1.183-2(a), Income Tax Regs.; Flowers v. Commissioner,supra at 932; Allen v. Commisisoner,72 T.C. 28, 33 (1979). This issue of whether a profit objective was present is determined at the partnership level, and whether the requisite intention exists is a question of fact to be resolved on the basis of all the facts and circumstances. Flowers v. Commissisoner,supra at 931-932; Brannen v. Commissioner,supra at 505; Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). [16] *184 Greater weight should be given to *183 objective facts than to mere statements of intent. Sec. 1.183-1(a), Income Tax Regs.; Churchman v. Commissioner,68 T.C. 696, 701 (1977). Our review of the record convinces us that respondent has failed to carry his burden of proof with respect to this issue. Complete books and records were kept that accurately reflected Penn-Centennial's activities. The general partners of Penn-Centennial, who were knowledgeable about the real estate business, testified that they devoted signficant amounts of time meeting with investment brokers, physically inspecting properties and making investment decisions on behalf of Penn-Centennial. We also determined that petitioner Mr. Sanderson, who also was knowledgeable about the real estate business, invested in Penn-Centennial with the objective of making a profit. Furthermore, we have found that there was a real and justified expectation that the property would appreciate in value. *185 While the evidence that a predominant profit objective existed is not overwhelming, we note that respondent, upon whom the burden of proof lies, failed to establish that the requisite profit motive was lacking. Decision will be entered under Rule 155.
Footnotes
1. Except for a few isolated transactions, J. C. Penney terminated its sale-leaseback program, in part, because it caused it to lose the increase in appreciation of the properties.↩
2. The fixed price was calculated to approximate the unamortized balance and accrued interest at any given time on the outstanding mortgage loans to Seamen's Bank for Savings and East River Savings Bank.↩
3. The disallowance of petitioners' claimed deductions for depreciation was raised in respondent's amended answer.↩
4. The Fourth Circuit, where an appeal in the instant case would lie, has confirmed the use of this test. See Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89, 91 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184↩ (1983).
5. The actual amount deducted twice was $6,558,667.69, $7,450,850 less $892,182.31 (the balance on the note due in 2006). 6. J. C. Penney had projected the fair rental value to be $30 per square foot during this period.↩
7. Since the statutory notice was issued for the taxable year ended December 31, 1977, the taxable year ended December 31, 1976 is not properly before us and, thus, the question of proper characterization of this deduction is likewise not properly before us. See sec. 6214(a) and (b). (Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in issue.) ↩
8. The parties apparently took the position at trial and on brief that the purchase price for the buildings was $5,770,850.↩
9. Respondent's reliance on Hilton v. Commissioner,74 T.C. 305 (1980), affd. 671 F.2d 316 (9th Cir. 1982) and Rice's Toyota World, Inc. v. Commissioner,supra, is also misplaced. In both cases the Court found that the respective sale-leaseback transactions provided no opportunity for economic profit and that there was no justification for the taxpayers' participation in those transactions apart from its tax consequences. In the instant case, however, we have determined that the sale-leaseback transaction did provide a realistic opportunity to realize an economic profit apart from tax benefits.
10. It should be mentioned that we have stated that the absence of significant positive cash flow during the lease term is a neutral factor with respect to the question of the validity of the sale-leaseback transaction. Hilton v. Commissioner,supra↩ at 348.
11. Petitioners also had a business purpose in making their investment in Penn-Centennial. Petitioner Mr. Sanderson was knowledgeable about business and real estate transactions. His testimony, which we found to be credible, was that he invested in Penn-Centennial with the objective of realizing current cash flow and long-term appreciation.↩
12. This Court has recognized that the existence of a net lease that shifts some economic burdens away from the owner of property is a neutral factor in determining the validity of a sale-leaseback transaction. Hilton v. Commissioner,supra↩ at 348.
13. In his statutory notice, respondent only disallowed petitioners' claimed share of Penn-Centennial's interest deduction. There is no profit objective test with respect to the question of the deductibility of interest. See Brannen v. Commissioner,78 T.C. 471, 499-500 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Jasionowski v. Commissioner,66 T.C. 312, 320 (1976). In his amended answer, respondent first raised the issue of whether claimed depreciation deductions should be disallowed on the grounds that Penn-Centennial's activities were not engaged in for profit. Thus, it is clear that the issue of whether Penn-Centennial was an activity engaged in for profit is a new matter for which respondent bears the burden of proof.
14. Although expenses incurred for the production of income as described in sec. 212 cannot give rise to partnership deductions (sec. 703(a)(2)(E)), they can be taken into account separately by each partner pursuant to the authority of sec. 1.702-1(a)(8)(i), Income Tax Regs. In the instant case, the deductions were taken by the partnership as expenses incurred in a trade or business. Neither Penn-Centennial nor petitioners claimed deductions under sec. 212(1) or sec. 212(2) on their returns, and no argument has been made at trial or on brief that the deductions claimed are anything other than trade or business expenses.
15. We note that this test is more stringent that the test to determine whether a sale-leaseback transaction will be upheld for Federal income tax purposes. The validity of a sale-leaseback transaction will be recognized if there was a business purpose for entering into the transaction or if the transaction had a reasonable possibility for nontax profit. There is no requirement that the sale-leaseback transaction must have been entered into with the predominant purpose and intention of making a profit. Thus, it is possible that a situation could arise where a valid sale-leaseback transaction could be an activity not engaged in for profit. ↩
16. Some of the relevant factors to be considered in determining whether an activity is engaged in for profit for purposes of section 162 are: (1) the manner in which the taxpayer carried on the activities; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs.Brannen v. Commissioner,78 T.C. at 507↩.